**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE, TENNESSEE**

| | | |
|---|---|---|
| **QUIANA JOHNSON, et al** | ) | |
| | ) | **No. 3:10-cv-0589** |
| **Plaintiffs,** | ) | |
| | ) | **JUDGE SHARP** |
| **vs.** | ) | |
| | ) | |
| **JOE SHELTON** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S EXPERT WITNESSES AND
MEMORANDUM OF LAW IN SUPPORT THEREOF**

Defendant Shelton has filed a Motion for Summary Judgment and in partial support for

that motion, said Defendant includes the testimony of two expert witnesses: Alexander Jason and

Robert Allen. The testimony and reports of both of these experts should be stricken by the Court

for the reasons set forth herein.


I.      Federal Rule of Evidence 702, *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, and
*Kumho Tire Co. v. Carmichael* Mandate the Exclusion of the Testimony and Reports of
Alexander Jason and Robert Allen


There has been no sufficient showing by the Defendant that "scientific, technical, or other

specialized knowledge will assist the trier of fact to understand the evidence or to determine a

fact in issue" in this case. FED.R.EVID. Rule 702. In the alternative, there has been no adequate

showing that the affidavit and expert testimony of Alexander Jason or Robert E. Allen, Jr. is

testimony that " is the product of reliable principles and methods". FED.R.EVID.Rule 702.

The admissibility of expert testimony was the central issue in *Daubert v. Merrell-Dow*

*Pharmaceuticals, Inc*., 509 U.S. 579(1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137

(1999). For the reliability analysis, the Supreme Court in *Daubert* stated the general role of a court would be to assess preliminarily "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." While many factors bear on this analysis, the Court suggested specific factors for the district courts to consider, including: scientific methodology or testing, publication and peer-review, the known or potential rate of error, the existence of standards and controls, and the general acceptance of the methodology within the relevant scientific

In *Kumho*, the Supreme Court further held that Rule 702 applies to expert testimony based on knowledge from skill and experience but said expert knowledge must be "reliable" on the assumption that the expert's opinion and testimony will have a reliable basis in the knowledge and experience of his discipline and held that the *Daubert* factors can be flexibly applied. In *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) and *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004) the Sixth Circuit Court of Appeals rejected one expert in this area (*Berry*) and accepted a more credentialed/more specialized expert (*Champion*). The Court ruled that expert testimony regarding use of deadly force by the police, such as this case presents, must be far more narrow and precise than a claim of specialty knowledge about "police practices" and cannot present "ungrounded and methodologically flawed testimony".

II.     The Affidavit and Testimony of Alexander Jason Violates Federal Rule of Evidence 702
and Is Not Admissible under *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, *Kumho Tire Co. v. Carmichael*, and Related Cases

Defendants' rely extensively on their alleged expert, Mr. Alexander Jason, quoting his opinion testimony 12 different times in their Memorandum in Support of Summary Judgment,

although Mr. Jason admits he is "not an authority on police practices." *Deposition of Alexander Jason* at p. 166. While much of Mr. Jason's opinions relate to body movements and the study thereof, Mr. Jason has never studied or received any degree in kinesiology. *Id*. at p. 155.

Between the Defendants' summary judgment memorandum and Mr. Jason's deposition, this gentleman is self-described as being an expert in more than 30 different fields of police practices and weapons, including:

(1) Defendants describe Mr. Jason as a "crime reconstruction expert" (*Docket Entry #70, Memorandum* at p. 6)

(2) Defendants describe Mr. Jason as a "crime-scene analyst" (*Id*. at p. 12);

(3) Defendants quote Mr. Jason as an expert on "use of deadly force" (*Id*. at p. 13; *Jason Depo*. at p. 37-38) ("The physical evidence is consistent with a restrained use of deadly force by Officer Shelton….");

(4) Expert in ballistic properties and how drywall is impacted. *Jason depo.* at p. 68.

(5) Expert in "blood splatter". *Id*. at p. 54.

(6) Expert in "gunshot wounds". *Id.* at p. 55.

(7) Expert in "some aspects of the pathology of gunshot wounds". *Id*. at p. 56.

(8) Expert in "muzzle flash". *Id*. at p. 78.

(9) Expert in the "effectiveness" of bullets. *Id*. at p. 83.

(10)     Expert in certain aspects of bullets. *Id*.

(11)     Expert in "body armor." *Id*.

(12)     Expert in the "effect of bullets on human tissue". *Id*.

(13)     Expert in "computer animation and simulation". *Id.* at p. 82.

(14)     Expert on the "dynamics of wounding." *Id*. at p. 84.

(15)     Expert on forensic animation. *Id.*

(16)     Expert on "instructional video programs on firearms". *Id.* at p. 92.

(17)     Expert on "wound ballistics". *Id.*

(18)     Expert on the "use of deadly force by civilians". *Id.*

(19)     Expert on "forensic firearms evidence" *Id.*

(20)     Expert in "firearm recoil dynamics". *Id* at p. 93.

(21)     Expert in the "use of firearms, how to use firearms, how to fire effectively, and ammunition choice, and gun choice…". *Id.* at p. 92.

(22)     Expert on "designed shooting courses, shooting events, evaluated marksmanship skills, and proficiency with handguns, rifles, shotguns. *Id.* at p. 95.

(23)     Expert in "shooting incident investigations." *Id.* at p. 94.

(24)     Expert on detection of blood on fired bullets. *Id.* at p. 97.

(25)     Expert on sequence of bullet wounds when sequence can be determined. *Id.* at p. 99.

(26)     Expert on forensic digital photography. *Id.* at p. 101.

(27)     Expert on some aspects of adrenaline under stress. *Id.* at p. 154.

(28)     Expert on certain aspects of kinesiology. *Id.* at p. 155.

(29)     Expert in human dynamics relating to shooting incidents. *Id.* at p. 159.

(30)     Expert in "gunshot wounds." *Id.* at p. 55.

Based on the foregoing, one could argue that Alexander Jason is the most expert witness in the long history of this Court. His multifarious fields of so-called expertise, though, are in areas where he is not qualified to render any opinion, let alone an expert opinion.

For example, in reaching his opinions in this case, Mr. Jason did not "review" or "refer" to any "published studies" except for his own research. *Id*. at pp. 163-164. He does not hold any academic degrees in criminology, criminal justice, police science, or any of the other subjects and fields of study above where Mr. Jason has self-described himself as an expert or any related field. *See generally D.E. #75, Exhibit 1, Expert Report*.  It appears that Mr. Jason has made a very comfortable living for more than three decades preparing expert witness reports. Mr. Jason served four years in the U.S. Army; went to two years of school in a Mexican university; and eventually received his undergraduate degree in journalism. *See id*. He worked a couple of years in the anti-terrorism unit of the San Francisco Police department in the late 1960s and early 1970s. *See id*. Then he worked corporate security for a couple of years primarily investigating people who were shooting the transformers owned by his employer. *See id*. For the past 30 or more years Mr. Jason has been self-employed with many consulting jobs with police departments and many, many reports as an expert for police departments (more than 95% of his expert witness reports appear to have been on behalf of police). For this case, through his deposition, the defendants have paid him more than $32,000. *Jason depo*. at p. 120.

In *Champion v. Outlook Nashville, Inc*., 380 F.3d 893 (6th Cir. 2004), Rehearing, en banc, denied by *Champion v. Outlook Nashville, Inc.*, 2004 U.S. App. LEXIS 23116; U.S. Supreme Court certiorari denied by *Dickhaus v. Champion*, 2005 U.S. LEXIS 3343 (U.S., Apr. 18, 2005), the Court carefully reviewed the differences between an expert in criminology and police practices who was not qualified to testify and a well-credentialed expert who was qualified in the specific area of use of excessive force (which is the issue in the instant case):

> "Finally, we evaluate the Officers' claim that the district court erred in permitting Alpert's expert testimony. HN22The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), established the standard for admissibility of

scientific expert testimony under Federal Rule of Evidence 702. The requirement that "any and all scientific testimony or evidence admitted [be] not only relevant, but reliable," Id. at 589, "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93. This test has also been applied to non-scientific expert testimony, such as Alpert's. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999).

The Officers argue that Alpert did not present any specialized knowledge that was reliable or of any assistance to the jury. The Officers rely principally [**40] on Berry v. City of Detroit, 25 F.3d 1342 (6th Cir. 1994), in which we held that the plaintiff's expert, a so-called specialist in the field of "police policies and practices" was not qualified to speak about the city government's policy of disciplining officers for alleged uses of excessive force. Id. at 1348-54. In Berry, we [***25] stated that "there is no such 'field' as 'police policies and practices,'" mainly because we believed that the concept of such a field as presented by that "expert" was far too broad. Id. at 1352. We analogized to the legal profession, stating that labeling the individual [*908] in Berry as an expert when he did not demonstrate that he had experience in any particular aspect of studying the police was "like declaring an attorney an expert in the 'law.'" Id. However, by reasoning that a divorce lawyer was no more an expert on patent law than anyone else, we implicitly recognized that individuals with specialized knowledge could most certainly serve as experts, i.e., patent lawyers can serve as experts in patent law. We did not hold that an individual cannot ever testify as an expert about some [**41] aspect of police affairs. Rather, the holding in Berry reasoned that unqualified individuals could not broadly testify about an area in which they possessed no specialized knowledge. While "police practices" in the broadest sense of the phrase may not be a field, surely criminology is.

Indeed, the chief reason for our decision in Berry was that the expert's credentials demonstrated that he had no specific expertise about police activities. He had limited experience, given that he was appointed as a deputy sheriff, a post that required almost no qualifications, and he had been fired twice from the position. Furthermore, he lacked any formal training or experience on the subject of criminology or police actions. Compounding the problem was his ungrounded and methodologically flawed testimony regarding what effect the City of Detroit's procedural shortcomings would have upon the future conduct of 5,000 police officers who would be confronted with a diverse and unpredictable array of situations in which force would be used. See Dickerson, 101 F.3d at 1163-64 (relying on the affidavit of a criminology professor, which opined that an officer used excessive force, [**42] in deciding that material fact

issues remained regarding qualified immunity); Estate of Boncher v. Brown County, 272 F.3d 484, 486 (7th Cir. 2001) (recognizing implicitly the field of criminology by labeling the expert a reputable [***26] criminologist, but excluding expert's affidavit as useless because it was too general).

By contrast, the Plaintiffs' expert, Alpert, testified about a discrete aspect of police practices, namely use of excessive force, based upon his particularized knowledge about the area. In contrast to the expert in Berry, Alpert's credentials are much more extensive and substantial. Alpert has a PhD in sociology from Washington State University, is employed by the University of South Carolina's Department of Criminology, teaches classes on police procedures and practices, has been involved with federal research funded by the Department of Justice that evaluates the use of force by officers, trains officers in the use of force, works with police departments to create use-of-force policies, has testified before Congress and state legislatures about police policies, and has authored forty to fifty articles on the subject of police procedures, [**43] many of which have appeared in peer-reviewed journals. Alpert Test., Transcript Vol III at 428-32 (Attached to Motion to Take Judicial Notice). Unlike the expert in Berry, Alpert testified about much more specific issues: the continuum of force employed by officers generally, the specific training the Officers received, and Alpert's opinion that if the witnesses' testimony is credited, the Officers' actions violated nationally recognized police standards governing excessive force. The critical difference between testifying about the impact of police policies upon a large group of officers and testifying about the proper actions of individual officers in one discrete situation highlights the inapplicability of Berry. HN23Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact. See Dickerson, 101 F.3d at 1163-64; Kladis v. Brezek, 823 F.2d 1014, 1019 (7th Cir. 1987). [*909] Because Alpert had considerable experience in the field of criminology and because he was testifying concerning a discrete area of police practices about which he had specialized [**44] knowledge, [***27] we hold that the district court did not abuse its considerable discretion in admitting Alpert's testimony."

Mr. Jason is primarily cited by defendant for two personal opinions: (1) that defendant Shelton or any similar police officer could have reasonably mistaken the iPod allegedly in the victim's pocket for a gun and (2) that it requires "less than half a second" for any person with their back turned to someone to fire a gun at that person or officer. *D.E. #70, Memorandum* at p. 12.

Both these alleged expert opinions ignore rules of law in *Tennessee v. Garner*, 471 U.S. 1 (1985) and numerous material facts in the instant case. *Garner* clearly established the Fourth Amendment rule of law that a police officer may not use deadly force, such as defendant Shelton did, against an apparently unarmed, fleeing suspect, unless deadly force is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. This opinion of Mr. Jason transforms the *Garner* constitutional requirement into every officer has probable cause to use deadly force so long as he believes the other person involved in an encounter has a gun- because the officer will always lose the battle of who can draw their gun the fastest. This opinion totally removes any necessity of an immediate serious threat to an officer or another person.

Mr. Jason's opinion is that it is axiomatic, since the other person can draw and shoot in "less than half a second" when their back is turned, every officer is empowered to shoot and use deadly force before any aggressive or offensive conduct. Instead of facts determining probable cause, it would be enough to justify deadly force simply if any citizen is armed. And in this case, where the deceased victim is not armed, the Defendant's subjective belief that anyone he approaches can shoot him in less than half a second justifies deadly force anytime the Defendant believes he sees a bulge inside that person's clothing.

Our society has different social and cultural values than the basis for Mr. Jason's personal opinion that defendant Shelton's shooting Mr. Wallace three times in the back was reasonable. The job of an American police officer is dangerous and sometimes violent. We place serious restrictions on the right of an officer to shoot, to detain, to limit a person's personal freedom. It would be far easier, and safer for the officer, to shoot first at the person whose back is turned, but those are not the rules in our glorious nation of freedom and liberty. A hallmark of our values

and heritage is that the government does not have life and death power except and unless certain process is followed, such as necessary facts to establish probable cause of imminent serious personal injury under *Garner*. There is a reason that the "good guys" in American culture such as our films and literature, and in American history, do not shoot people in the back. There is a reason that when Mr. Ford, according to legend at least, shot the desperado Jesse James in the back that Mr. Ford was ridiculed. Our beliefs in justice and democracy make it difficult for our police officers and other protectors. Officers who choose to serve and protect are very aware of our beliefs in justice and reasonable officers who are properly trained uphold those principles. Mr. Jason's opinion is not admissible because his belief, or opinion, is not compatible with our notions of justice and do not properly reflect the law of police- citizen encounters.

There are also serious questions about whether *any* methodology and principles whatsoever were used and followed by Mr. Jason in reaching his opinions. He does not really describe any detailed principles or methodology he followed or used in his report and opinion. *See generally D.E. #75, Exhibit 1*. Instead Mr. Jason describes his background and the "experiments" that he devised and videotaped or photographed of concealing a gun in a pants pocket, drawing a gun from a pants pocket, firing a gun backwards from three different positions and the length of time it takes. Mr. Jason gets it exactly backwards in terms of expert work and experimentation.

As we all learned about scientific method at some point in our education, an expert starts with a hypothesis, carefully stating the hypothesis and then making real world examinations or conducting experiments, or both, then writing a description of same that proves or disproves the hypothesis, submits their study for peer review and then, hopefully publication so that other experts can replicate the study and achieve the same outcome or opinion; or create doubt about

the first study by repeating it with different results. Oxford English Dictionary (entry for scientific), accord Goldhaber, Alfred Scharff; Nieto, Michael Martin (January–March 2010),, Rev. Mod. Phys. (American Physical Society) 82: 939, doi:10.1103/RevModPhys.82.939.

Mr. Jason did not make measurements or a real world examination of the crime scene in the instant case even though he viewed his "task in this case to examine the physical evidence… ." *Jason depo*. at p. 136. Instead, he merely drove by the crime scene while in an automobile and defendant Shelton answered his questions later at the police academy. Defendant Shelton did not "demonstrate" at the crime scene for Mr. Jason as to where the physical bodies of defendant Shelton or the deceased Mr. Wallace were and did not "demonstrate" at the crime scene how and where the officer and the deceased moved around at the scene. *Id*. at pp. 37-38. Despite his failure to personally inspect the crime scene, Mr. Jason admitted it was "fundamentally important… in order to give [his] expert opinion" for him to get an "accurate picture of what the movements were, where the physical bodies were, and how they moved… ." *Id*. at pp. 38, 42.

It seems highly probable that Mr. Jason either started with the opinion and used his experiments to justify it or that Mr. Jason made the age old mistake of not controlling his experiments because he already had a conscious or unconscious bias as to what he wanted the outcome to be. For example, there does not appear to be any governing principles or control methodology in Mr. Jason's experiment. Are all the persons who unconceal a gun, draw and fire, with their back turned – in less than "half a second" self-selected? Are they responding to an advertisement or solicitation and if so, does it inform them what the purpose of the experiment is? Are they very familiar with firing a gun or are they very unfamiliar? Do they practice at a gun range every day or once a year or never? Do they compete in fast draw competitions? Do each of them start with the gun inside their clothing or already in their hand? Do each of them unconceal

the gun from their pants pocket, and if so, what is the cut/design on that pocket that makes it tight or loose, easy or difficult to get to and draw? Are each of them the same or widely different in age, state of health, physical agility, emotional stability, etc.? Was each person told they were drawing their gun to fire and kill or injure a law enforcement officer, or were they told they were defending themselves and the good guys? When asked, Mr. Jason admitted the pants in his photos are not "the same style and cut of jeans" as those worn by the deceased Mr. Wallace. *Jason depo*. at p. 142.

In proper methodology, these and many other control factors would be thought through and designed and then a careful segmentation and cross sectioning of different persons and factors would be randomly assigned to different groups for different repetitions and recordings of many experiments. From Mr. Jason's affidavit and report, none of this happened and thus his opinion is not based on appropriate principles and methodology. The burden of proof under Rule 702 and *Daubert* and its progeny on whether the expert opinion is properly based on appropriate methodology is upon Mr. Jason.

When asked about issues regarding the iPod and his backyard set of experiments at his deposition, Mr. Jason gave very interesting answers. The persons firing guns in his videotaped experiments were not firing a gun like the one used by officer Shelton to shoot the deceased in the back. Instead they were drawing and firing pellet guns. *Jason depo*.  at p. 48.

For another example, Mr. Jason was asked about the photographs he made to support and/or show his opinions. Specifically, he was asked why the cut and design of the pants pockets in his photographs in his expert report was different from the cut and design of the actual deceased victim's pants pocket relating to the perception of what a reasonable officer would believe he was seeing in another person's pants pocket. How far does it stick out in the photos as

compared to what happened at the crime scene? No one knows. That lack of methodology is doubly worse since Mr. Jason admitted he paid no attention to different pants pocket styles and how they were cut since according to Mr. Jason that just didn't matter to him. As part of the same experiment, Mr. Jason only used an iPod to stick partially out of the pocket in the photos attached to his report, yet there is also a calculator taken from the deceased pants pocket and that calculator has very different exterior appearance. *Jason depo*. at pp. 46, 121. Also, Mr. Jason did not know how different the thickness of the iPod was compared to a gun. He did not measure them. *Id*. at 131.

For another example, one of Mr. Jason's experiments in his report in this case is firing a gun into a brick wall in attempt to disagree with Plaintiff's expert Phillip Davidson. Plaintiff's expert said a particular gun would make hole in a brick wall. Mr. Jason claimed he was wrong and told someone to go to Home Depot and buy bricks and mortar; build a wall; and Mr. Jason fired a gun into it and made no hoe in the brick wall. When asked about this experiment, Mr. Jason could not identify what kind of bricks were purchased and used and could not identify what kind of mortar was bought and used. Again, no controlling principles or methodology was employed by Mr. Jason in his experiments.

The next problem with Mr. Jason's "experiments" is the timing. This lawsuit and his opinions are not about some kind of fast draw competition where a start signal is given and the persons in the experiment draw and fire and the expert times from the "start" to the firing of the gun – which it appears from his report is how Mr. Jason conducted his experiment. In real life, including this case, a reasonable officer upon encountering a person he or she believes to be suspicious is going to interact with that person. A reasonable officer will not begin that interaction by assuming the person can draw and fire in the first half second. Instead, that

interaction may be conversation or commands or a frisk or a search or a detention or an arrest or other circumstances, to each of which the suspect will make a response and the reasonable officer will evaluate that response and conduct. Obviously, the level and nature of the interaction will vary in almost every situation and the reasonable officer is trained and knowledgeable in the continuum of force or level of force the officer will use to respond as the interaction continues.

The principle utilized by a real expert in analyzing the officers' actions is to study the many and various uses of force in the continuum and weigh the actions of both the suspect and the officer in that process. The reasonable officer has to evaluate and decide what level and nature of force to use according to the suspects' various actions, the physical geography or setting, from verbal commands, show of officers' weapon, police dog, assistance from other nearby officers, physical force (of several different types), physical restraints, and to deadly force. Mr. Jason has isolated only one small area of the interaction (draw and fire) between police and suspect and by ignoring all the other interaction between the officer and suspect, Mr. Jason makes his measurement of time not relevant.

What is relevant in this context is how and why and where the various uses of force by the officer evolved. It is not disputed in this case that the defendant officer gave verbal commands, urged his police dog to attack the deceased, issued various commands, drew and showed his police gun, then a little later re-holstered his police gun while the deceased attempted to climb a fence to flee while police dog continued to attack the deceased, struggled with hands with the deceased over what was in the deceased pants pocket, more verbal commands and physical attempts by defendant to secure and grip the deceased while the deceased kept trying to climb the fence and then the defendant Shelton drew his gun again and while the dog continued, defendant Shelton shot him three times in the back and killed the deceased. The issue in this case

is not the "time" from drawing to shooting, but in resorting to deadly force at that point did the defendant make a reasonable or an excessive use of force. It is the interaction and the continuum of force decisions that are relevant. Any reasonable officer understands and is trained to evaluate a person of interest or a suspect and their action and reactions. Therefore, for the reasonable officer the "timing" starts when the encounter or interaction starts – not at the point when someone pulls a gun. Mr. Jason admitted at his deposition that he is not an expert on "use of force." *Jason depo*. at p. 123.

Mr. Jason's opinions are simply not supported by any principles or methodology that has been replicated and subjected to appropriate peer review. As argued in Plaintiffs' Memorandum of Law In Opposition to Summary Judgment, Mr. Wallace (the deceased victim) was not carrying any weapon, had not threatened anybody, and it is questionable whether he even committed a felony. Also, as acknowledged by both parties, Mr. Wallace (the deceased victim) was not committing the alleged felony at the time of his encounter with Defendant police officer Shelton. If any felony occurred, it had already taken place at another location and Mr. Wallace was hiding under a deck at the time the Defendant officer Shelton had his police dog mangle Mr. Wallace and force him out from under the deck.

Also, Mr. Jason admitted at his deposition there are no peer reviewed studies or findings that support or agree with Mr. Jason's opinion that a reasonable officer could have "perceive[d]" the object in the deceased pants pocket to be a gun and a reasonable officer would not "easily distinguish" between an iPod and a gun by touching the object while in the pants. Instead Mr. Jason admits that his opinion on this matter is his "common sense." *Jason depo*. at p. 131. Accordingly, since it is only "common-sense" it does not qualify as expert opinion testimony and is not admissible. It should also be noted that none of the defendants' experts can offer any

reason why the deceased who was being chewed up by a police dog and menaced by an officer pointing a gun at him would be attempting to pull an iPod (or a calculator) out of his pocket. Common sense suggests that claim is not credible.

There are other issues about peer review all through Mr. Jason's career. When asked at his deposition whether there was peer reviewed publications that supported his various opinions, Mr. Jason said his own videos are his peer review (with the exception of one article) and then said that his presentations to conventions and law enforcement conferences were peer reviewed. However, he then admitted that none of his many presentations on his C.V. were in writing and upon probing some of these conferences, some took place in people's homes. *Jason depo*. at pp. 58, 103, 145; 148-149. Then Mr. Jason argues that his video experiments on guns and timing do not have to be peer reviewed. *Id*. at p. 150. Then Mr. Jason describes his not very careful selection of the persons depicted in his videotaped experiments. They are his daughter, a guy at the shooting range that he has seen around and an electrician who helps him out. *Id*. at p. 152.

The case law since *Daubert* questions very seriously whether opinions such as those developed by Mr. Jason are admissible. Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995). In this case, Mr. Jason was paid by defendants to conduct the backyard experiments that are the basis of his opinions. Whether the expert has unreasonably extrapolated from an accepted premise to an unfounded conclusion. *See General Elec. Co. v. Joiner*, 522 U.S. 136 [139 L. Ed. 2d 508], 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

Furthermore, whether the expert has adequately accounted for obvious alternative explanations. *See Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition).  Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *See Kumho Tire Co. v. Carmichael*, 143 L. Ed. 2d 238, 119 S.Ct. 1167, 1176 (1999) (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the toxicological cause of the plaintiffs respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable).

Each of these factors strongly suggests that defendants have failed to demonstrate reliability for the opinions of Mr. Jason. The admissibility of his "expert" testimony is governed by the principles of Rule 104(a) and under that rule, the proponent of the expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 97 L. Ed. 2d 144 (1987).

As the Sixth Circuit Court of Appeals  recently stated in *Newell Rubbermaid, Inc. v. Raymond Corp.*, No. 10-3912, 12a0089p.06;, 2012 U.S. App. LEXIS 6597; (6th Cir. 2012) "A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v.*

*Merrell Dow Pharms.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). One key consideration is "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id*. at 592-93. The inquiry is "a flexible one," and "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate." *Id*. at 594-95."   See also, *Andler v. Clear Channel Broad., Inc*., 670 F.3d 717; 2012 U.S. App. LEXIS 4070; 2012 FED App. 0059P (6th Cir.2012); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262; 2010 U.S. App. LEXIS 10172 (6th Cir.2010); *Brainard v. Am. Skandia Life Assur. Corp.,* 432 F.3d 655, 657 (6th Cir. 2005).("[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation.").

For all these reasons, Mr. Jason's testimony should be excluded.


III.     The Affidavit and Testimony of Robert E. Allen, Jr. Should be Stricken

Criminology is a recognized as a field suitable for expert testimony; "police practices and policies" are not.  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir. 2004).  Here, although Mr. Allen attached a copy of his curriculum vitae to his Affidavit and Rule 26(a)(2) Report, an examination of his resume reveals that he is not qualified to render an opinion in the above-styled case.  *D.E. # 74, 74-1*.  Indeed, unlike the witness in *Champion*, 380 F.3d 893 at 908, whom the Sixth Circuit confirmed was qualified to serve as an expert—and who was a college professor with a PhD in sociology—Mr. Allen does not indicate any formal education concerning the appropriate use of force by a police officer. *Id*.  Further, although Mr. Allen states that his responsibilities include teaching recruits at the Metropolitan Nashville Police Department ("MNPD") Training Academy, he does not articulate what his teaching responsibilities entail.  *Id*.  He does not, for example, state that his training activities include

physically touching recruits, and does not explain what things are actually done to instruct recruits about the proper use of deadly force.  *Id*.  Accordingly, Mr. Allen's testimony should be stricken.

Additionally, Mr. Allen's testimony does not present any reliable, specialized knowledge, and should therefore be stricken.  A threshold flaw in Mr. Allen's proposed expert testimony is the matter of his employment with MNPD.  Indeed, as a current MNPD employee, Mr. Allen's bias is necessarily so severe that his testimony concerning the events of March 12, 2012 cannot and should not be afforded any weight.  Accordingly, Mr. Allen's proposed expert testimony should be stricken.

Finally, Mr. Allen's testimony is irrelevant, in that he appears to testify as to facts that he neither experienced nor witnessed, and then speculates that Officer Shelton's actions were reasonable as a matter of subjective and objective fact.  But it is the responsibility of fact witnesses, not Mr. Allen, to paint the canvas of what happened in the minutes leading up to Mr. Wallace's death, and his proposed testimony does not, and cannot, contribute anything to this effort.  Likewise, it is the jury's responsibility to determine whether Officer Shelton acted reasonably.  Unlike the traditional areas of expertise, such as the mechanics of a rocket ship, medical treatment provided to an accident victim or the pecuniary value of a patent, a police officer's "reasonableness" in shooting and killing an unarmed civilian is simply not the type of inquiry that requires, or benefits, from a proposed expert witness, and certainly not from a proposed witness who is employed by the same government agency as the police officer.  *D.E. # 74-1*.  Therefore, his testimony should be stricken.

## IV. CONCLUSION

The "expert" testimony and reports offered by the defendants should be excluded and stricken for failure to comply with the requirements of Rule 702 and applicable case law. Their "experts" fail to state and describe principles and methodologies that are "reliable" upon which to base their alleged expert testimony and they lack proper or sufficient credentials in their field to offer such alleged expert testimony.

Finally, there is no showing by the Defendants that excessive force versus reasonable force is an issue that requires or permits of expert testimony when the defendant police officer has killed an unarmed man by shooting him three times in the back. Such use of excessive force claims should be decided by the objective reasonableness standard and there is no showing that expert testimony is necessary or even helpful on that standard in such a case as this.

Respectfully submitted,

/s/ Allen Woods_____
Larry Woods, #2395
Allen Woods, #23103
PO Box 128498
Nashville, TN 37212
(615) 321-1426
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing document was sent via the Court's electronic filing system to the following:

JOHN M. L. BROWN
222 Second Avenue North, Suite 312
Nashville, Tennessee 37201

KELI J. OLIVER

Assistant Metropolitan Attorney
P.O. Box 196300
Nashville, Tennessee 37219

on this 29th day of April, 2012.

/s/ Allen Woods
Allen Woods