UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CLARISSE SWEAT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:10-0589 |
| ) | Judge Sharp |
| ) | |
| JOE SHELTON, in his official and ) | |
| individual capacities, JOHN DOE ) | |
| POLICE OFFICERS #1-#20, in their ) | |
| official and individual capacities, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the Court in this excessive force case is Defendant Joe Shelton's ("Officer Shelton's") Motion for Summary Judgment (Docket No. 69).[1]  Also pending are Plaintiff Clarisse Sweat's ("Sweat's") Motions to Strike certain affidavits and expert testimony (Docket Nos. 82 & 83) filed in support of the summary judgment motion. Those Motions have been fully briefed by the parties and, for the following reasons, the Court will deny Officer Shelton's Motion for Summary Judgment, and also deny Plaintiff's Motions to Strike.

### I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

After being awakened by the sound of an intruder in his home at 10:30 a.m. on March 12, 2010, Kyle Marion ("Marion") called 911, and spoke with the operator while the burglar was in the next room. By the time police arrived, the burglar had absconded, but Marion was able to tell them

---

[1] Officer Shelton has also filed a Motion to Ascertain Status (Docket No. 85) which is rendered moot in light of this Court's ruling on the pending Motion for Summary Judgment.

1

that several items were missing from his home, including an iPod Touch that had a black front and silver-colored sides and back.

At the time of the incident, Officer Shelton, a K-9 handler and 24-year veteran of the Metropolitan Nashville Police Department ("MNPD"), was monitoring radio transmission and heard about the burglary at Marion's residence. He also heard officers, who had been in an unsuccessful foot pursuit, describe the suspect. Along with his K-9 partner Memphis, a Belgian Malinois, Officer Shelton responded to the call.

Upon arriving at the scene, Officer Shelton confirmed that there had actually been a residential burglary, and determined the situation met departmental policy for the deployment of a police dog. A patrol officer took Officer Shelton to the last place officers had actually seen the suspect before he eluded them, which was across the street from a residence located at 1026 Villa Place.

Officer Shelton radioed dispatch, and told the operator to instruct officers in the area to remain in their cars so they would not contaminate the scent trail left by the fleeing suspect. Officer Shelton then deployed K-9 Memphis.

Attached to a tracking harness and a 15-foot lead, K-9 Memphis led Officer Shelton across the street and onto the deck of 1026 Villa Place. K-9 Memphis located the suspect, later identified as Reginald Wallace ("Wallace"), hiding under the part of the deck that ran along the side of the house.[2]

Officer Shelton released the lead, K-9 Memphis went under the deck after Wallace, and

---

[2] The deck was L-shaped, running down part of the side of the house, then turning to the left and continuing across part of the rear of the house.

Officer Shelton ran to the rear portion of the house to look under the deck. From that vantage point, Officer Shelton could see K-9 Memphis holding onto Wallace with his teeth, and jerking back. Wallace had his hand in the right front pocket of his pants, and Officer Shelton, thinking that he might be reaching for a gun, knife or rock, unholstered his service pistol.

Officer Shelton told Wallace to stop resisting and show his hands. Wallace removed his hands from his pocket and Officer Shelton re-holstered his weapon.

Wallace crawled toward the end of the deck by digging in with his left arm and pulling himself forward, dragging K-9 Memphis along. Upon exiting from under the deck, Wallace began kicking and trying to sling K-9 Memphis off his leg. All four of the dog's feet came off the ground during this attempt.

Wallace then tried to escape over a privacy fence while K-9 Memphis was still holding onto his leg. As Officer Shelton pulled Wallace off the fence, Wallace swung his arm back and struck Shelton with a glancing blow to the side of his face.

During the ensuing struggle, Officer Shelton was behind Wallace and to his right, trying to control him. K-9 Memphis was still attached to Wallace's leg.

Wallace again put his hand into his right pants pocket, whereupon Officer Shelton attempted to "trap" Wallace's hand in his pocket, by grabbing the outside of the pocket with his own hands and holding onto Wallace's hand through the material of the pocket.[3]

Officer Shelton could feel Wallace's hand through the material of the pocket. He also felt a hard object with a squared off-edge, and saw a "silverish" object protruding a half inch or inch

---

[3] At the training academy, recruits are taught this technique, with the goal being to trap the suspect's hand in his pocket, while at the same time trying to feel what may be in the pocket.

3

from his pocket. Officer Shelton thought that the edge might be the slide or back-strap of a pistol.

According to Officer Shelton, he continued to tell Wallace to show his hands and quit resisting. In his deposition he described what happened next:

> A. I began to think I was too close to the suspect. I could tell I was losing my hold on him. I went to spin him around to get some distance from him and pushed off. And I drew my weapon and fired.
>
> Q. How far were you from the fence at this point?
>
> A. 3 to 4 feet.
>
> Q. So you were attempting to push him –
>
> A. And that's when I – at that time I just shoved off of him and pushed him directly away from me.
>
> Q. At that time did you have a fear that you were about to be shot?
>
> A. Yes, sir.
>
> Q. Is that fear based on anything other than what you have already described for me?
>
> A. No, sir.
>
> Q. When you drew your weapon, how much distance was there between you and Mr. Wallace?
>
> A. I don't remember, sir.
>
> Q. Did you pause before discharging your first bullet?
>
> A. I don't believe so, sir.
>
> Q. Was Mr. Wallace facing you when you discharged your weapon?
>
> A. I believe – I do not know, sir.
>
> Q. What did you aim for when you discharged your weapon?
>
> A. I did not aim, sir.

> Q. When you discharged the first bullet was Mr. Wallace standing up.
>
> A. Yes sir. I believe he was.
>
> Q. Was there any pause between the three shots?
>
> A. None that I remember.
>
> Q. How much time elapsed between each shot that was fired?
>
> A. Not very much time. Enough time to reset the trigger.
>
> Q. Less than a second?
>
> A. Absolutely. Yes sir.
>
> Q. What happened after you fired the third shot?
>
> A. He fell to the ground. I could see the weapon come out of his pocket and fly over to the ground. I began yelling, "Shots fired." . . .

(Shelton Depo., Docket No. 81-10 at 141-143).[4]

All three of Officer Shelton's shots struck Wallace in the back, one or more of which resulted in Wallace's death. The object Officer Shelton observed falling out of Wallace pocket was, in fact, an Ipod. Police also discovered a remote control that had been in Wallace's possession, near his body.

Based on these events, Quiana Johnson, the biological mother of the Wallace's minor son; Karissa Sweat, Wallace's surviving spouse; and Waynnesia Brooks, the decedent's daughter, filed suit in this Court against the Metropolitan Government of Nashville and Davidson County ("Metro"), Officer Shelton and unknown John Doe police officers. Plaintiffs set forth § 1983 claims

---

[4] In a subsequent Affidavit, Officer Shelton stated that he was wearing or carrying over 30 pounds of police clothing and equipment, and that, at the time of the shooting, he "was nearly exhausted because of the intensity of the struggle and the weight of [his] equipment." (Shelton Aff. Docket No. 73 ¶¶ 5 & 45p).

against Officer Shelton and the John Doe Defendants in their individual capacities (Counts 1 and 2); a § 1983 claim against Metro for negligent hiring and for failure to train, discipline, and supervise police officers (Count 3); a wrongful death claim against Metro under respondeat superior and supervisory liability negligence theories pursuant to the Tennessee Governmental Tort Liability Act ("TGTLA") (Count 4); an assault claim against Officer Shelton and the John Doe police officers, together with a negligence claim against Metro under the TGTLA (Count 5); a claim for negligent infliction of emotional distress against Metro under the TGTLA (Count 6); and claims for outrageous conduct against Officer Shelton and the John Doe police officers (Counts 7 & 8).

By Memorandum and Order (Docket Nos. 46 & 47) entered September 13, 2010, Judge Campbell dismissed all claims, except for Sweat's § 1983 claims against Officer Shelton and the John Doe police officer in their individual capacities for the alleged violation of Wallace's Fourth Amendment rights as set forth in Counts 1 and 2. Officer Shelton now moves for summary judgment on those claims, arguments which the Court considers after addressing Plaintiff's Motions to Strike.

## II. MOTIONS TO STRIKE

### A. Officer Shelton's Affidavit

Plaintiff moves to strike Officer Shelton's affidavit, arguing that "[m]uch of the . . . affidavit directly contradicts the sworn testimony Shelton gave at his deposition." (Docket No. 83 at 1). Plaintiff then goes on to identify six alleged discrepancies between Shelton's affidavit and his deposition testimony.

The Sixth Circuit has repeatedly held that a party cannot create a genuine issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony. Aerel, S.R.I. v.

6

PCC Airfoils, LLC, 488 F.3d 899, 906 (6th Cir. 2006)(collecting cases). The Sixth Circuit has also held, however, that a party may submit a post- deposition affidavit in which the party seeks to clarify or amplify issues which were not sufficiently covered in the deposition. Id. The real concern is whether the party is attempting to create a sham issue in presenting the post-deposition affidavit. Id. at 909.

In this case, the Court has compared Shelton's affidavit with his deposition testimony and finds no effort to create a sham issue. Rather, some of the assertions made merely answer that which went unasked at his deposition, some assertions amplify that which was answered at the deposition, and some assertions merely confirm that which is found elsewhere in the record.

Just by way of example, Plaintiff notes that Officer Shelton did not testify in his deposition that, immediately prior to the shooting, he attempted a "sweep takedown" of Wallace. However, he was not asked a question which would necessarily prompt that response, and, in any event, he specifically stated in his answers to Plaintiff's interrogatories that he "tried unsuccessfully to do a sweep takedown using my left hand, while still trying to hold [Wallace's] hand in his pocket with my other hand." (Docket No. 85-1 at 6). Regardless, striking Shelton's Affidavit is wholly unnecessary because the Court decides that summary judgment is inappropriate even in light of his affidavit.

## B. Expert Testimony

In support of his Motion for Summary Judgment, Officer Shelton proffers expert testimony from Alexander Jason ("Jason") and Robert E. Allen, Jr. ("Allen").[5] Plaintiff moves to strike any

---

[5] As with Officer Shelton's Affidavit, it is unnecessary to strike Jason's and Allen's testimony because the Court is denying summary judgment, notwithstanding those filings. Nevertheless, the Court addresses Plaintiff's arguments because they undoubtedly will resurface in anticipation of the upcoming trial.

7

testimony from those witnesses, arguing their testimony will not assist the trier of fact, and there has been no showing that either based their testimony on reliable principles and methodologies as required by Fed. R. Evid. 702 and the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

> Rule 702 provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. This Court has previously discussed the interplay between Rule 702, Daubert, and Kumho, as follows:

> . . . The present version of Rule 702 codified the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which held that the then-effective Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify" and "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 589 & 597, 113 S.Ct. 2786. This "gatekeeping" function has as its objective "to ensure the reliability and relevancy of expert testimony." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id.
>
> In considering challenges to the reliability of scientific evidence, the focus is on the methodology utilized by the expert, not on the conclusion drawn. See, Daubert, 509 U.S. at 590, 113 S.Ct. 2786. Factors which the Supreme Court in Daubert identified as being possibly relevant include: (1) whether the theory, conclusion, or technique has been tested or is testable; (2) whether it has been published or subjected to peer review; (3) whether it has a potential or known error rate; and (4) whether the theory, conclusion, or technique enjoys general acceptance

within the relevant scientific community. Id. at 593–94, 113 S.Ct. 2786; see, Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 251 n. 5 (6th Cir. 2001).

These factors do not apply to every situation, nor are they exclusive. "Rather, ... the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho, 526 U.S. at 152, 119 S.Ct. 1167. "That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony." Id.

In short "Daubert attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." Best v. Lowe's Home Centers, Inc., 563 F.3d 171, 176–77 (6th Cir. 2009). Still, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596, 113 S.Ct. 2786.

United States v. Roberts, 830 F.Supp.2d 372, 377 (M.D. Tenn. 2011).

Here, Plaintiff levels a broad-ranging attack on Jason, beginning with the assertion that he "is self-described as being an expert in more than 30 different fields of police practices and weapons[.]" (Docket No. 82 at 2). This is an overstatement, and Jason appears qualified to opine generally on the reasonableness of Officer Shelton's actions given a curriculum vitae which shows Jason (1) is Board Certified as a Senior Crime Scene Analyst, with specialized training and experience in the reconstruction and analysis of shooting incidents; (2) has been accepted as an expert in crime scene reconstruction, shooting, and wound ballistics cases; (3) has performed analysis and reconstructions on more than 300 shooting incidents; and (4) has performed substantial research on the time, movement and dynamics of shooting incidents, including authoring a paper entitled "Shooting Dynamics: Elements of Time and Movement in Shooting Incidents," among other things. (Docket No. 75-1 at 1).

That said, at least one portion of Jason's expert testimony gives some pause for concern. He

9

opines that it requires "less than half a second" for a person with a gun in his pocket to fire at someone standing behind him. Whether the methodology employed was sufficiently similar to the facts in this case is something the Court will hear more about prior to the time that Jason will be allowed to testify as to this opinion.

As for Allen, Plaintiff argues he is unqualified to render an opinion because he has no "formal education concerning the appropriate use of force by a police officer." (Docket No. 82 at 17). But one can be qualified as an expert based upon training, and Allen has been a Metro police officer for 31 years, has been assigned to the MNPD training academy since 1991, has been the head instructor of firearms and defensive tactics since 1993, and has taught thousands of hours in the areas of defensive tactics, firearms, and officer survival. See, Lee v. Metro. Gov't of Nashville & Davidson County, 596 F.Supp.2d 1101, 1122 (M.D. Tenn. 2011) (officer's nearly three decades of experience in the police department, including work as a high level supervisor, lecturer and instructor, make him uniquely qualified to discuss whether the defendants' used an appropriate level of force here).

Plaintiff also challenges Allen because he is presently employed by the MNPD. However, Fed. R. Civ. P. 26(a)(2)(b) envisions employees testifying as experts by providing an exception to the written report requirement for "individuals who are employed by a party and whose duties do not regularly involve giving expert testimony," Torres v. City of Los Angeles, 548 F.3d 1197, 1214 (9th Cir. 2008), and, in any event, "'[t]he Supreme Court has consistently held that a witness's bias and partiality is a legitimate subject of cross-examination." Batey v. Scutt, 2012 WL 400590 at *6 (6th Cir. Feb. 8, 2012); see, DiCarlo v. Keller Ladders, Inc., 211 F.3d 465, 468 (8th Cir. 2000) (citation omitted) ("Determining the credibility of a witness is the jury's province, whether the

witness is lay or expert, and "'[a]n expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination'")).

Finally, Plaintiff argues that Allen's testimony "is irrelevant, in that he appears to testify as to facts that he neither experienced or witnessed, and then speculates that Officer Shelton's actions were reasonable as a matter of subjective and objective facts." (Docket No. 82 at 18). Forgetting that this is a curious argument for Plaintiff to make since her expert is in the very same position, most experts do not witness the events about which they testify. Moreover, "[d]eadly force cases pose a particularly difficult problem . . . because the officer defendant is often the only surviving witness," and, therefore, all evidence in the record should be considered, Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994), unless, of course, it is incompetent.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party

11

does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B. Legal Analysis**

Plaintiff Sweat's remaining § 1983 claims against Officer Shelton and the John Doe Defendants are based upon alleged violation of the Fourth Amendment. Under the Fourth Amendment, "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person," and, "while it is not always clear just when minimal police interference becomes a seizure, . . . there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S.1, 7 (1985). Officer Shelton's motion for summary judgment is based upon his contention that his actions were objectively reasonable under the circumstances, and, therefore, that he is entitled to qualified immunity.

Qualified immunity is an affirmative defense which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Sixth Circuit has set forth the

12

analysis to be employed in determining whether the defense of qualified immunity applies:

> [A]s a precursor to the Harlow qualified immunity analysis, a court must first determine whether any constitutional violation occurred, let alone the violation of a clearly established right. E.g., Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); Jackson v. Leighton, 168 F.3d 903, 909 (6th Cir. 1999). Consequently, if [the court] find[s] no constitutional violation, then the case must be dismissed at this threshold stage[.] Where a constitutional violation exists, the court must next determine whether the right infringed was clearly established – by decisions of the Supreme Court, this Court, or other Courts of Appeal – at the time the defendant allegedly infringed it. See Higgason v. Stephens, 288 F.3d 868, 876 (6th Cir. 2002) (citing Walton v. City of Southfield, 995 F.2d 1331, 1336 (6th Cir. 1993)). Finally, if the right is clearly established, we cannot impose liability on a state official unless "the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right[ ]." Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999)(en banc) (citing Dickerson v. McClellan, 101 F.3d 1151, 1157-58 (6th Cir. 1996)).

McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005).[6]

Because Plaintiff claims that Officer Shelton used excessive force, "the relevant question is whether the officers' use of force complied with that allowable under the Fourth Amendment." Simmonds v. Genesee County, ___ F.3d ___, ___, 2012 WL 2290981 at * 5 (6th Cir. June 19, 2012). "Any claim of excessive force is evaluated under the objective standard of 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Id. (quoting, Graham v. Connor, 490 U.S. 386, 397 (1989)).

In making the objectively reasonableness determination, the Court looks at "1) the severity

---

[6] Although the Supreme Court in Saucier indicated that a court should first determine whether a constitutional violation occurred, and then proceed to the issue of whether the violation involved a clearly established right, it later held that while this sequence "is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 129 S.Ct. 808, 818 (2009). Instead, courts should use "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

of the crime, 2) whether the suspect poses an immediate threat to the safety of the officer or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." Ciminillo v. Streicher, 434 F.3d 461, 467 (6th Cir. 2006). These factors are not exhaustive, however, because,

> the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure." St. John v. Hickey, 411 F.3d 762, 771 (6th Cir. 2005) (quoting Graham, 490 U.S. at 396). Furthermore, reasonableness must be judged from the perspective of a reasonable officer on the scene, not with the 20/20 vision of hindsight. See Terry v. Ohio, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir.2002).

Id.

In this case, the Court cannot conclude, as a matter of law, that Officer Shelton's response to the perceived threat was objectively reasonable, notwithstanding the fact that Wallace had allegedly committed a relatively serious crime – burglary of an occupied dwelling, and notwithstanding the fact that he was actively resisting arrest and attempting to flee. This is because questions of fact exists as to whether he actually posed an immediate threat to Officer Shelton, even accepting everything Officer Shelton says as true.

A reasonable jury could conclude that Wallace did not pose an immediate threat when he was shot, based upon a number of things, including, but not limited to, the following:

→ at no time did Wallace pull out a weapon (or anything that could be perceived as a weapon), let alone point the object in Officer Shelton's direction, even though Wallace had an opportunity to do so beginning from the time when he crawled out from under the deck;

→ Wallace was not warned that he might be shot;

→ Wallace was shot not once, but three times in the back at a time while a police

14

dog was attached to his leg; and

→ one of the shots may have been fired when Wallace was falling to the ground, and it is impossible to tell which of the shots was fatal.

In setting forth the foregoing, the Court is in no way suggesting that an officer must wait until a suspect actually points a weapon at him or must also issue a warning before using deadly force, and this is true even when the suspect's back is to the officer. As Jason (one of Defendant's expert witnesses) explained, there are at least three different ways by which a suspect with his back to an officer can pull a pistol out of his pants pocket and shoot the officer in less than half a second.[7] However, Jason's opinion is premised on the proposition that it was reasonable for Officer Shelton to believe that what Wallace had in his pocket was a weapon, a proposition which Jason conceded in his deposition was based on "a common sense type of knowledge" (Docket No. 81-3, Jason Depo. at 131), and which, therefore, is a question for the jury. See, Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 905 (6th Cir. 2006) (citation omitted) ("'expert testimony does not assist where the jury has no need [ ] for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic.'").

Moreover, while a "court may be hesitant to doubt [an officer's] testimony . . . 'the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" Jefferson v. Lewis, 595 F.3d 454, 462 (6th Cir. 2010) (citation omitted). Thus, the Court "must

---

[7] According to Jason, the suspect can (1) flip his wrist as soon as the weapon clears his pocket, firing the pistol upside down at the officer standing behind him; (2) reach over his opposite shoulder, and aim directly behind him at the officer; or (3) rotate his body clockwise (if he is right handed), firing a shot back at the officer. As previously noted, whether Jason will be allowed to testify as to this opinion is a question which the Court reserves until trial.

15

Case 3:10-cv-00589 Document 100 Filed 07/10/12 Page 15 of 19 PageID #: 1109

carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts.'" Scott, 39 F.3d at 915.

In this case, Plaintiff has proffered an expert report from Phillip L. Davidson ("Davidson"), a former police officer, zone commander, and police use of force instructor for the MNPD. He opines that "no reasonable police officer could disagree that at the point that Shelton made the decision to shoot Wallace that he had no probable cause to believe that his life was in danger and that the shooting was unnecessary and unreasonable." (Docket No. 81-4 at 9). It will be for the jury to determine whether Davidson's conclusion is sound, just as it will be for the jury to determine whether Officer Shelton is credible in his retelling of the events that led to the shooting.

In arriving at the conclusion that a trial is necessary, the Court has thoroughly considered not only the expert testimony provided by Officer Shelton, but also the cases on which he relies. Officer Shelton claims that Dudley v. Eden, 260 F.3d 722 (6th Cir. 2000) presented "facts . . . remarkably similar to those in the case at bar." However, apart from the fact that the suspect in Dudley was shot while unarmed, that case and this case are readily distinguishable.

Dudley involved a bank robber's "plan to commit suicide by police intervention." Id. at 723. Towards that end, and after robbing a bank, Dudley drove a stolen car to the back of a bar and awaited the arrival of police. Ultimately, Dudley was shot by Officer Eden after a chase resulted in a collision. In finding Officer Eden's actions reasonable as a matter of law, the Sixth Circuit wrote:

> . . . When Officer Eden received a call from the police dispatcher he was told Dudley had just committed a bank robbery. Although the dispatcher reported that Dudley had not displayed any weapons while robbing the bank, Eden reasonably perceived a real possibility that, like many bank robbers, Dudley was armed. Officer Eden arrived at the scene and saw Officer Lewis standing by Dudley's vehicle in a parking

16

> lot. Moments later, Dudley accelerated out of the parking lot and shots were fired. Dudley swerved recklessly into oncoming rush hour traffic before returning to the correct side of the street and heading west towards Route 91. Given Dudley's bank robbery, his refusal to comply with the commands of armed policemen, his attempt to evade arrest, and his reckless driving, it was reasonable for Officer Eden to conclude that Dudley posed a serious threat to himself and others.
>
> In addition, it is clear that the collision between Dudley and Eden did not decrease the threat that Dudley posed. When the two cars collided, the front end of Dudley's car smashed into the driver's side door of Officer Eden's police cruiser. Although the cars slowed to a halt, there is no evidence that Officer Eden had Dudley under control. If Dudley had put his car into reverse, he could have continued his escape and Eden would have been powerless to stop him. It would have only taken a few seconds for Dudley to swerve back into oncoming traffic and hit an innocent motorist as he had almost done minutes before.
>
> Furthermore, the position of the cars meant that if Dudley were armed he would have had a clear shot at Officer Eden, who was slightly in front of Dudley and ill-positioned to see the suspect. Although it is true that Dudley was not armed and had no intention of killing anyone except for himself, there is no way that Officer Eden could have known this. Given Officer Eden's precarious position and the uncertainty of this rapidly evolving situation, no jury could find that Officer Eden's fear and his use of force were unreasonable.

Id. at 726.

Here, it is true that Officer Shelton, like Officer Eden, could not know what was in the suspect's head. However, it is also true that whether Wallace actually posed a threat to others is open to question, whereas, in Dudley, the officer used deadly force against the backdrop of having heard shots fired, witnessing reckless driving, and facing a person who had robbed a bank and whose hands could not be seen.

Officer Shelton also relies upon Williams v. City of Grosse Pointe Park, 496 F.3d 482, 486 (6th Cir. 2007) in which the Sixth Circuit found that an officer who shot a suspect in the back of the neck acted reasonably. However, the court did so in the context of a case – captured on video – where the driver of a stolen car backed into a police cruiser in an effort to escape and, with an officer
17

hanging on the side of the vehicle pointing a gun at his head, accelerated forward, throwing the officer from the car, and prompting another officer to shoot.[8]

Admittedly, there are legal propositions from each of the cases relied upon by Officer Shelton which support his assertion of qualified immunity, including the fact that whether the suspect turns out to be unarmed (Dudley, Sherrod) or shot in the back (Williams) is not definitive, nor is it required that a suspect be seen to be in total control of a firearm (Henning) before deadly force may be appropriate. The issue of qualified immunity, however, is a "fact-driven inquiry" in which the court "must give careful attention to the particular facts and circumstance," Dudley, 260 F.3d at 723, and, having done so, the Court concludes that a jury could potentially find that Officer Shelton acted unreasonably.

As for the second-prong of the qualified immunity analysis, Officer Shelton argues that "[o]n March 12, 2010, there was no clearly established law informing [him] that it was unconstitutional under the facts of this case to use deadly force on a violently resisting suspect who [he] reasonably perceived was trying to draw a handgun out of his pocket." (Docket No. 70 at 22). He further argues that Plaintiff "has failed to show that the right allegedly violated was clearly established in a particularized sense, such that a reasonable police officer confronted with the *same* situation would have known that his actions would violate that right." (Id. underlining in original, italics added).

"At the time of the shooting, it was clearly established under Tennessee v. Garner, . . . , that

---

[8] Officer Shelton's reliance upon a couple of Seventh Circuit cases is even more attenuated. Sherrod v. Berry, 856 F.2d 802 (7th Cir. 1988) is distinguishable because it dealt with the issue of whether evidence that a suspect was unarmed should have been made known to the jury, not whether the case was properly submitted to the jury in the first place. Henning v. O'Leary, 477 F.3d 492 (7th Cir. 2007) involved a shooting which occurred after the suspect fought with three officers, was pepper sprayed and repeatedly hit with a baton, and, after an officer's gun fell from his holster, officers believed that the suspect had his hand on the gun or near it.

18

police officers may not fire at non-dangerous fleeing felons," and that the "'use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." Kirby v. Duva, 530 F.3d 475, 483 (6th Cir. 2008) (quoting, Garner, 471 U.S. at 11). Whether Wallace was actually dangerous and posed an immediate threat to Officer Shelton's safety is something a jury needs to decide because Officer Shelton's argument is premised upon what he claims was reasonable, something which Davidson, at least, has called into doubt. See, id. (quoting, Graham, 490 U.S. at 396) (qualified immunity is inappropriate where, "even without 'the 20/20 vision of hindsight,' . . . a jury could conclude that reasonable officers would not have perceived an immediate threat.").

### IV. CONCLUSION

On the basis of the foregoing, Officer Shelton's Motion for Summary Judgment (Docket No. 69) will be denied and his Motion to Ascertain Status (Docket No. 89) will be denied as moot. Plaintiff's Motions to Strike (Docket Nos. 82 & 83) will also be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE